**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LUIGI BUITRAGO | ) |
| | ) |
|     **Plaintiff,** | ) |
| | ) |
|     v. | ) Civil Action No. 18-261 (EGS) |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| | ) |
| MURIEL BOWSER, MAYOR OF | ) |
| THE DISTRICT OF COLUMBIA | ) |
| | ) |
|     **Defendants.** | ) |
| | ) Date: August 21, 2018 |

**SECOND AMENDED COMPLAINT**
**(National Origin & Disability Discrimination; Retaliation)**

Pursuant to Federal Rule of Civil Procedure Rule 6(b), Plaintiff Luigi Buitrago (hereafter "Plaintiff"), by his undersigned attorney, hereby files his Complaint against his former employer, the D.C. Department of Health (hereafter "Defendant").

**JURISDICTION AND VENUE**

1. This Court has jurisdiction of the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e-5(f).

2. On or about June 10, 2015, Plaintiff filed a formal Charge of Discrimination, EEOC No. 570-2015-00998, with the EEOC.

3. The EEOC accepted Plaintiff's formal Charge of Discrimination as timely.

4. Defendant was duly notified about Plaintiff's administrative complaints and was given an opportunity to respond to his allegations.

5. On October 11, 2017, the EEOC made a decision on the merits of Plaintiff's discrimination claims and on November 7, 2017, issued him a Notice of Right to Sue.

6. The originally filed Complaint in this matter was filed within 90 days after Plaintiff received the Notice of Right to Sue on his EEOC complaint.

7. Plaintiff has exhausted the administrative remedies available to him under 42 U.S.C. §§ 2000e, et seq., and all conditions precedent have occurred or been performed.

8. Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(c), as Defendant D.C. Department of Health (hereinafter "Defendant") has extensive and deliberate contacts in this District and Division, including a business location at 899 North Capitol Street, NE, Washington, DC 20002, at which Plaintiff performed work during his tenure with Defendant.

## II. THE PARTIES

9. Plaintiff is a resident of the District of Columbia and a former employee of Defendant.

10. Defendant is a subdivision of the District of Columbia government created pursuant to District of Columbia law.

## III. FACTS CENTRAL TO PLAINTIFF'S CLAIMS

11. Plaintiff is a homosexual, Hispanic male of Panamanian origin.

12. Plaintiff began working for Defendant as a Public Health Analyst on October 30, 2005.

13. For his prior work as a consultant to the Office of HIV/AIDS Policy at the US Department of Health and Human Services, the Surgeon General awarded Plaintiff for his work on HIV/AIDS.

14. As a Public Health Analyst, Plaintiff was paid a yearly salary of $73,373.

15. Plaintiff's first line supervisor was Lawrence Frison, Public Health Analyst, and Plaintiff's second line supervisor was Gunther Freehill, Bureau Chief.

16. On July 25, 2006, Plaintiff was injured on the job while helping take down tents from an event put on by the HIV/AIDS Administration, a division of the DC Department of Health. Plaintiff was thrown to the ground and injured his lower back.

17. Plaintiff experienced excruciating and stabbing pain.

18. Plaintiff followed protocol for an incident occurring in the field and contacted the office.

19. Mr. Freehill informed Plaintiff that he needed to return the DC vehicle he drove to the site, or he would face termination. Plaintiff returned the vehicle.

20. Plaintiff called and sent an email to Peter Luciano, DOH Risk Management, submitting the incident report per Defendant's protocol the day after the accident.

21. Mr. Freehill failed to submit the incident report to the DC Office of Risk Management (ORM) and the Administrative Support Manager (ASM).

22. The Acting Senior Deputy Director, Dr. Pierre Vigilance, did not force Mr. Freehill to submit the incident report until April 4, 2007.

23. On or around July 26, 2006, Plaintiff was diagnosed with a bulged disk and strained back.

24. This injury continues to impact Plaintiff's everyday life: Plaintiff lost mobility in his left leg, he relies in an wheelchair and/or a cane to get around, he frequently falls when attempting to move, he is unable to lift anything heavier that ten pounds, he has been forced to stop running as he routinely did before the accident and as a result has gained forty pounds and

become sedentary, if he does not receive his physical therapy treatments he becomes bedridden due to the excessive and chronic pain, and he suffers side effects from the pain medication including but not limited to mood swings and ED.

25. Due to the extensive medical treatment Plaintiff required, and still requires, he missed a significant number of workdays, exceeding what Defendant allots for sick time.

26. However, Plaintiff was not placed on disability leave because of the failure of the Bureau Chief's failure to timely submit his incident report.

27. On May 6, 2008, the Director of the DC Department of Health approved Plaintiff's restoration leave of 204 hours of annual leave and 207 hours of sick leave.

28. Plaintiff used this leave because the HIV/AIDS Administration did not properly file his workman's compensation claim in a timely manner.

29. Plaintiff's injury required multiple surgeries. After a surgery in September 2008, he was placed on Total Disability for an entire year. Thereafter, Plaintiff was in and out of the office due to Defendant's failure to meet to provide an ergonomic work station per Plaintiff's physician's orders.

30. In December 2011, Defendant forced Plaintiff to return to work after threatening him with termination.

31. In January 2012, Defendant laid off Plaintiff while he was receiving workers' compensation benefits. Defendant asserted the dismissal was due to a reduction in force.

32. In or around November 2012, Plaintiff filed a claim with the EEOC on the basis of disability and national origin discrimination, Charge Number 570-2013-00077 in addition to prior grievances filed by local AFGE 2978 former president Robert Mayfield.

33. In or around January 2013, Plaintiff and Defendant reached an agreement to resolve the EEOC claim and all pending grievances regarding discrimination and wrongful RIF as a returned injured worker. Both parties ratified this agreement as binding.

34. The settlement included terms reinstating Plaintiff to his former position, awarding Plaintiff lost wages, accrued leave, and continuation of flexible work schedule in order to continue Plaintiff's physical therapy treatments associated with the 2006 injury.

35. In February 2013, Plaintiff returned to work as an "injured worker".

36. When Plaintiff returned to work, his new supervisor was Charlissa Quick (hereafter "Quick"). Quick and all of Plaintiff's co-workers were African American females.

37. Plaintiff, DOH Human Resources, and DOH Labor Relations staff all had conversations with Quick to make her aware of the settlement agreement and Defendant's obligations therein.

38. When Plaintiff returned to work, Quick violated the terms of the settlement agreement by not reasonably accommodating a flexible work schedule for Plaintiff so he could attend physical therapy appointments.

39. Quick required Plaintiff to work 8.5 hours daily and leave the office before 6:00 PM.

40. However, a female co-worker, Eartha Issacs, who also had a reasonable accommodation, was allowed to arrive late and leave after 6:30 PM.

41. Plaintiff received negative evaluations with comments about his communication skills and was required to undergo training. However, Plaintiff's colleagues did not receive similar comments or training requests.

42. Plaintiff was frequently asked by team members to help them on their work and tasks.

43. He sent coherent emails that effectively communicated with team members on those tasks.

44. These evaluations were discriminatory in nature because Plaintiff was the only Hispanic male under Quick's supervision, and she favored the other African American females under her supervision.

45. Quick also exhibited hostility toward Plaintiff because he had previously filed a charge of discrimination against Defendant with the EEOC. This was exhibited by Quick's denial of Plaintiff's requests for a tablet and smartphone so that he could work remotely. Other employees under Quick's supervision were granted such equipment.

46. In June 2015, Plaintiff filed another complaint with the EEOC, Charge Number 570-2015-00998. The claim was for retaliation for prior protected activity and discrimination based on Plaintiff's sex, national origin, and disability.

47. In July 2015, Quick requested documentation from HR to prove Plaintiff's workers' compensation benefits.

48. In or around October 2015, Plaintiff met with the Deputy Director for Programs Community Health Administration, Djinge Lindsay, and informed her that ADA accommodations had been requested but not fulfilled as required by the settlement agreement.

49. She replied that Plaintiff never filed the paperwork, or there was no record of it. Plaintiff filed the requisite paperwork timely.

50. Later in October 2015, in a follow-up meeting after the meeting with Lindsay, Plaintiff met with Kathleen Ognibene (hereafter "Ognibene"), an HR Officer.

51. Ognibene indicated to Plaintiff that his prior ADA requests should be approved per the terms of the settlement agreement.

52. In or around November 2015, Plaintiff provided the Deputy Director for Programs the requested ADA Accommodation Request Intake Form.

53. The form requested protected leave and flex schedule, which included time off from work in order to attend medical appointments related to the 2006 work injury. The form specifically requested two chiropractor appointments per week and other related appointments, up to three times per week. The form also contained an agreement that required Plaintiff to provide updates on his medical prognosis every 120 days, which were to be reported to Ognibene and Human Resources. Pursuant to this agreement, Ognibene requested that he re-submit a request for a flexible schedule.

54. On December 8, 2015, Plaintiff re-submitted his request for approval.

55. On January 5, 2016, Plaintiff met with Ognibene, Dr. Torey Mack, and Carroll Ward regarding his updated workers' compensation claim and subsequent reporting time.

56. Defendant granted Plaintiff leave for his appointments, and all other sick leave required for his appointments. Plaintiff was required to provide a weekly schedule of his physical therapy appointments, and his flexible schedule was approved in this meeting.

57. On or around January 28, 2016, Quick and ORM sent Plaintiff emails informing him that his physical therapy sessions were no longer paid for without explanation.

58. This left Plaintiff without medical care, directly violating the agreements as signed by the DC Office of the Attorney General.

59. On January 29, 2016, Plaintiff notified Human Resources about the information he received regarding the deauthorization of his physical therapy visits. Plaintiff was instructed to use his personal leave, not administrative leave, for his physical therapy. However, Plaintiff had to continue to submit his schedule of upcoming appointments to his supervisor.

60. Upon information and belief, Plaintiff believes that the termination of medical payments was related to his request for administrative leave to attend his medical visits.

61. On February 10, 2016, Plaintiff met with Justin Zimmerman, Associate Director of Policy and Compliance in the HR department as the EEOC officer for DCHR. Plaintiff reported all of the issues he was having from his superiors and upper management at the department.

62. Zimmerman told Plaintiff he would open an investigation. He instructed his staff to follow up with Plaintiff and create a timeline.

63. Between February and June 2016, Plaintiff was reassigned to the Cancer division, and Defendant hired a consultant to do Plaintiff's work on HIV/AIDS.

64. Plaintiff then was returned to HIV/AIDS because Defendant was planning a RIF.

65. Defendant was required to return all staffers to their positions, however Plaintiff was never returned to his former duties, as the consultant was still performing them.

66. On June 3, 2016, Zimmerman sent Plaintiff a letter notifying him that the investigation had been completed, and Plaintiff was permitted to file a formal complaint of discrimination within fifteen days or submit this letter to EEOC.

67. In October 2016, Plaintiff met with Dr. LaQuandra Nesbitt in regards to the RIF where she indicated that Plaintiff's employment was not "career" but rather was a "term" position.

68. Dr. Nesbitt requested documentation of Plaintiff's job application.

69. Plaintiff did not have to apply for his position, as it was given back to him under the settlement agreement.

70. Additionally, the settlement agreement expressly states that Plaintiff was to be returned to a career position, and filling the position was listed as "non-competitive."

71. Plaintiff was then forced to re-apply and compete for his job, and Defendant claimed that Plaintiff never competed for any jobs at DOH.

72. On May 19, 2017, Defendant sent Plaintiff another termination letter. The letter stated that Defendant would not renew Plaintiff's "Term Appointment."

73. Plaintiff discussed the termination letter with the ASM and HR.

74. Plaintiff was placed on administrative leave until his termination became effective September 30, 2017.

75. Upon information and belief, Plaintiff believes that Defendant terminated him because of his complaints that his prior EEOC settlement agreement was violated along with the additional discrimination he encountered when he returned to work with Defendant.

76. Any reason Defendant gives for the different terms and conditions of employment and discharge is pretext to discrimination against him due to his national origin and disability.

77. As a result of the Defendant's actions, Plaintiff has suffered loss of income, emotional distress, and pecuniary damages. Plaintiff continues to require extensive medical procedures, physical therapy, and sees a therapist as needed to cope with emotional distress.

## IV. STATEMENT OF CLAIMS

### Count I: National Origin Discrimination (Title VII)

78. Plaintiff adopts and incorporates by reference ¶¶ 1-77 above.

79. As stated above, Plaintiff is a Hispanic male of Panamanian origin.

80. Defendant unlawfully discriminated against plaintiff on the basis of his national origin in violation of Title VII.

81. Plaintiff is the only individual of Panamanian origin in his department.  Plaintiff is also the only person in his department who is not a female African American.

82. Specifically, Defendant discriminated against Plaintiff by refusing to accommodate schedule for physical therapy appointments, de-authorizing Plaintiff's ability to receive physical therapy treatments, and forcing Plaintiff to use his personal leave to receive these required physical therapy treatments. However, a female African American co-worker was given a flexible work schedule to accommodate her personal medical needs.

83. As a result of Defendant's violations of Title VII, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

## Count II: Disability Discrimination (ADA)

84. Plaintiff adopts and incorporates by reference ¶¶ 1-83 above.

85. As stated above, Plaintiff was injured on the job on July 25, 2006. As a result of this injury Plaintiff needs physical therapy treatment and other medical attention and treatment.

86. Defendant unlawfully discriminated against Plaintiff on the basis of his disability in violation of the Americans with Disabilities Act of 1990.

87. Specifically, Defendant discriminated against Plaintiff by refusing to accommodate schedule for physical therapy appointments, de-authorizing Plaintiff's ability to receive physical therapy treatments, and forcing Plaintiff to use his personal leave to receive these required physical therapy treatments.

88. As a result of Defendant's violations of the Americans with Disabilities Act of 1990, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

## Count III: Retaliation (Title VII & ADA)

89. Plaintiff adopts and incorporates by reference ¶¶ 1-88 above.

90. As stated above, Plaintiff filed a claim with the EEOC on the basis of disability and national origin discrimination in November 2012. Additionally, Plaintiff's Union on his behalf filed a grievance claiming that his initial layoff was a form of retaliation.

91. Defendant retaliated against Plaintiff when he returned to work after filing a complaint against the office. Defendant retaliated against Plaintiff by wrongfully discontinuing his flexible leave to receive the proper medical attention he needed as a result of a work-related injury.

92. Further, Defendant retaliated against Plaintiff for his complaint to the EEOC about discrimination by deauthorizing the medical therapy Plaintiff needed.

93. As a result of Defendant's violations of the Title VII and the Americans with Disabilities Act of 1990 retaliation clauses, Plaintiff has suffered and is suffering injuries, including loss of past, present, and future earnings and considerable mental distress.

## Count IV: Breach of Contract

94. Plaintiff adopts and incorporates by reference ¶¶ 1-93 above.

95. As stated, Defendant entered into a binding agreement with Defendant to settle his EEOC charge in January 2013. Under this agreement, Defendant promised to: (1) restore Plaintiff to a "career," "non-competitive" position; (2) provide Plaintiff with an ergonomic workstation; (3) allow Plaintiff to utilize administrative leave to attend all necessary physical therapy appointments; (4) cover the expense of all necessary medical treatment and physical therapy sessions.

96. Defendant breached the terms of the agreement by: (1) terminating Plaintiff's employment claiming he was in a "competitive," "term" position; (2) failing to provide Plaintiff with an ergonomic workstation; (3) abruptly prohibiting Plaintiff from utilizing administrative

leave for his medical and physical therapy appointments; and (4) refusing to cover the cost of Plaintiff's medical and physical therapy appointments.

97. As a result of the aforementioned breaches, Plaintiff has sustained monetary damages in an amount not yet determined due to the ongoing harm caused by Defendant's breach of the EEOC Settlement Agreement.

98. Plaintiff is also entitled to specific enforcement of Defendant's promises, and such other and further relief as may be appropriate arising out of or related to Defendant's breach of its contractual obligations.

## IV. REMEDIES SOUGHT

99. WHEREFORE, Plaintiff respectfully requests that the Court issue a judgment granting him the following relief from Defendant:

a. A declaratory judgment that defendant discriminated against Plaintiff, as alleged herein;

b. Back pay, including without limitation other lost benefits due to Defendant's discrimination against Plaintiff;

c. Compensatory and punitive damages, pursuant to Section 102 of the Civil Rights Act of 1991, 42 U.S.C. §§ 1981a(a)(2), 1981a(b)(3)(A), for taking these actions with malice and bad faith;

d. Prejudgment and post judgment interest on all damages, on the lost compensation and compensatory damages;

e. Reasonable attorneys' fees and costs under 42 U.S.C. §§ 1981a, 2000e-5(k); and

f. Such other and further relief as to the Court seems just and warranted.

## VI. JURY TRIAL DEMAND

100. Plaintiff requests a jury trial on all issues of fact and damages arising herein.

Respectfully submitted,

*Edgar Ndjatou*

_____

EDGAR NDJATOU
Fed Bar No. 18107
McCree Ndjatou, PLLC
1828 L Street, NW, Suite 600
Washington, DC 20036
T: (202) 290-3724
F: (202) 370-7173
endjatou@mnlawyerspllc.com
*Plaintiff's Counsel*

13